UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                    :
AURELIUS CAPITAL MASTER, LTD.;                      :
ACP MASTER, LTD.; NOVORIVER S.A.;                   :
683 CAPITAL PARTNERS, LP; ADONA LLC;                :
EGOZ I LLC; EGOZ II LLC; MASTERGEN,                 :
LLC; ERYTHRINA, LLC; AP 2016 1, LLC; AP             :
2014 3A, LLC; AP 2014 2, LLC; WASO                  :
HOLDING CORPORATION; APE GROUP SPA;                 :
ROMANO CONSULTING SPA; ICARO SRL;                   :      No.
and ELAZAR ROMANO,                                  :
                                                    :      **COMPLAINT**
                        Plaintiffs,                 :
                                                    :
          - against -                               :
                                                    :
THE REPUBLIC OF ARGENTINA,                          :
                                                    :
                        Defendant.                  :
                                                    :
---------------------------------------------------------------x

      Plaintiffs Aurelius Capital Master, Ltd.; ACP Master, Ltd.; Novoriver

S.A.; 683 Capital Partners, LP; Adona LLC; Egoz I LLC; Egoz II LLC; Mastergen,

LLC; Erythrina, LLC; AP 2016 1, LLC; AP 2014 3A, LLC; AP 2014 2, LLC; WASO

Holding Corporation; Ape Group SpA; Romano Consulting SpA; Icaro SRL; and

Elazar Romano (collectively, "**Plaintiffs**"), by their undersigned counsel, allege as

follows, based upon knowledge as to their own acts and upon information and belief as

to all others:

<u>**Revival Pursuant to N.Y. C.P.L.R. 205(a)**</u>

1.     Plaintiffs bring this action pursuant to N.Y. C.P.L.R. 205(a) following the termination of six prior, coordinated actions in this Court (the "**Prior Actions**").[1]  In accordance with C.P.L.R. 205(a):  (i) the Prior Actions were timely commenced by Plaintiffs; (ii) the Prior Actions were terminated in a manner other than "a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute, or a final judgment upon the merits;" (iii) this action is based "upon the same transaction or occurrence or series of transactions or occurrences" as the Prior Actions; and (iv) this action is being commenced and service is being effected within six months of the dismissal of the Prior Actions on April 1, 2024.[2]

2.     Specifically, Plaintiffs commenced the Prior Actions on various dates between January 14, 2019 and December 10, 2020, seeking to recover unpaid amounts for Reference Year (as defined herein) 2013 due on securities issued by defendant the Republic of Argentina ("**Argentina**" or the "**Republic**"), namely the

---

[1] The Prior Actions are:  (i) *Aurelius Capital Master, Ltd. v. The Republic of Argentina*, No. 19-cv-351 (LAP) (S.D.N.Y.); (ii) *ACP Master, Ltd. v. The Republic of Argentina*, No. 19-cv-10109 (LAP) (S.D.N.Y.); (iii) *Novoriver S.A. v. Argentine Republic*, No. 19-cv-09786 (LAP) (S.D.N.Y.); (iv) *683 Capital Partners, LP v. The Republic of Argentina*, No. 19 Civ. 10131 (LAP) (S.D.N.Y.); (v) *Adona LLC, Egoz I LLC, Egoz II LLC, Mastergen, LLC, Erythrina, LLC, AP 2016 1, LLC, AP 2014 3A, LLC, AP 2014 2, LLC, and WASO Holding Corp. v. The Republic of Argentina*, No. 19 Civ. 11338 (LAP) (S.D.N.Y.); and (vi) *Ape Group SPA, Romano Consulting SPA, Icaro SRL, and Elazar Romano v. The Republic of Argentina*, No. 20 Civ. 10409 (LAP) (S.D.N.Y.).

[2] Although entered on April 1, 2024, the Judgment dismissing the Prior Actions is dated March 31, 2024.

2005-issued U.S. Dollar-Denominated New York law GDP-Linked Securities (ISIN: US040114GM64) and the 2010-issued U.S. Dollar- Denominated New York law GDP-Linked Securities (ISIN: XS0501197262). These securities are referred to herein respectively as the "**2005 GDP Securities**" and the "**2010 GDP Securities**", and collectively as the "**GDP Securities**" or the "**Securities**".

       3.     This Court dismissed the Prior Actions on Argentina's motion for summary judgment and concluded that "it is unnecessary to reach . . . the merits of Plaintiffs' breach-of-contract claims." Instead, the Court only ruled on a "threshold question[] of whether Plaintiffs' claims are properly before this Court." Specifically, it found that Plaintiffs did not satisfy the "preconditions set forth in the No-Action Clause" in the documents governing the GDP Securities, which "precludes [Plaintiffs] from bringing suit . . . and, accordingly, their claims are not properly before the Court." Plaintiffs relied on an exception to the No-Action Clause to bring suit individually and are appealing this Court's summary judgment ruling.

       4.     Since the dismissal of the Prior Actions, Plaintiffs have complied with the "No-Action Clause" and now timely reassert, pursuant to C.P.L.R. 205(a), their claims for breach of contract or, in the alternative, breach of the covenant of good faith and fair dealing, to recover unpaid amounts due for Reference Year 2013, as asserted in the Prior Actions.

## Nature of the Action

       5.     Argentina issued the GDP Securities in 2005 and 2010 as part of exchange offers pursuant to which defaulted debt previously issued by Argentina was exchanged for new securities issued by Argentina. In the exchange offers, holders of defaulted bonds received new bonds representing a steep "haircut" from the face

3

amount (or interest coupon) of the bonds they were tendering, plus GDP Securities providing for contingent additional payments based on the performance of the Argentine economy through 2035 (after which the GDP Securities expire).  In essence, tendering bondholders provided Argentina many billions of dollars of debt relief in return for a participation in the ensuing growth of Argentina's economy.

6.      The GDP Securities were an important part of that bargain.  The GDP Securities obligated Argentina to make payments when, in any of the ensuing 30 years, the country's real GDP met certain contractually specified benchmarks.  In fact, the holders of GDP Securities received payments for six of the first eight years they were outstanding (2005 through 2011, except 2009 and 2012).

7.      The GDP Securities set forth the terms and conditions for determining whether Argentina owes a payment to Securities holders for a given year— what the Securities refer to as a **Reference Year.**  Specifically, the GDP Securities require the Republic to pay the "**Payment Amount**" (as calculated pursuant to the detailed specifications in the Securities) subject to three conditions.  The first two conditions relate to Argentina's real (*i.e.*, measured in constant prices) gross domestic product ("**GDP**").  The **first condition** is that Argentina's "Actual Real GDP" for the Reference Year must exceed the "Base Case GDP" for that year.  The **second condition** is that year-over-year Actual Real GDP Growth for the Reference Year must exceed year-over-year "Base Case GDP Growth."  The **third condition** is that the payment cap of $8.1 billion has not been reached.

8.      By late 2013 and early 2014, it was clear that all three conditions would be satisfied for Reference Year 2013, and that Argentina would owe a substantial

payment under the GDP Securities for that year.  The data published by Argentina's own statistical agency—the Instituto Nacional de Estadística y Censos (or National Institute of Statistics and Censuses), known by its Spanish acronym **INDEC**, which is part of the Ministry of Economy—confirmed that Argentina's Actual Real GDP for 2013 exceeded Base Case GDP for that year, and that Actual Real GDP Growth for 2013 exceeded Base Case GDP Growth for that year.  Rather than fulfill its obligations and pay what it contractually owed, Argentina instead pursued a bad faith course of conduct that breached the contract and sought to destroy or injure the rights of GDP Securities holders, such as Plaintiffs, to receive the fruits of the contract.

9.     In or about late 2013/early 2014, Argentina announced that it would "rebase," *i.e.*, use a new year of constant prices to calculate real GDP.  The Securities expressly contemplate the possibility of rebasing.  As Argentina admits, when there has been a change in the "Year of Base Prices," the contract expressly requires adjustment of Base Case GDP for the relevant year by multiplying Base Case GDP by a contractually specified adjustment fraction—the numerator is Actual Real GDP for the year in question measured in the prices from the new Year of Base Prices (here 2004), and the denominator is Actual Real GDP measured in the prices from the original Year of Base Prices (1993).  The adjustment ensures that merely changing the Year of Base Prices does not affect whether Argentina owes a payment.

10.     On or about December 15, 2014, when payment was due for Reference Year 2013, Argentina announced—contrary to what had been expected based upon the data published by INDEC—that no payment was due for 2013 because, supposedly, Actual Real GDP Growth for 2013 did not exceed Base Case GDP Growth

for 2013.  In doing so, Argentina relied upon a patently incorrect reading of the contract terms regarding adjustment of Base Case GDP, and attempted to benefit from its own improper decision not to publish the data input used as the denominator for the adjustment calculation for 2013: Actual Real GDP measured in the prices from the original Year of Base Prices (1993).

11.     The basis for Argentina's announcement—and the contention it maintained in the Prior Actions—is that even where there has been a change in the Year of Base Prices, Base Case GDP Growth should be determined by using underlined unadjusted Base Case GDP figures for the relevant years.  Thus, in asserting that Actual Real GDP Growth for 2013 did not exceed Base Case GDP Growth for 2013 (the second condition in the Securities), Argentina compared Actual Real GDP Growth for 2013 *in 2004 prices* to Base Case GDP Growth for 2013 in *1993 prices*, *i.e.*, without adjusting the Base Case GDP figures as required by the contract.  In fact, Actual Real GDP Growth for 2013 (using Actual Real GDP for 2013 measured in 2004 prices as required by the contract) was 2.925%, and Base Case GDP Growth for 2013 (using Base Case GDP figures adjusted as required by the contract) was substantially lower.  Thus, the second condition was satisfied.

12.     Argentina's flawed interpretation of the contract, and in particular its use of unadjusted Base Case GDP for 2013 to determine the Base Case GDP Growth threshold, was rejected by this Court in the Prior Actions as "atextual" and is a breach of the contract.  Put another way, Argentina tried to unilaterally change the explicit terms of the parties' agreement.  But the "Modifications" provision of the contract is clear that Argentina does not have the power to do that.  To the contrary, any

4866-9062-1929.1

changes to the contract terms require a supermajority vote of Securities holders, which Argentina never sought.

13.     In addition to relying upon an incorrect reading of the contract, Argentina has advanced in the Prior Actions another meritless justification for its failure to pay the Payment Amount due for 2013.  Specifically, Argentina has contended that because INDEC—a part of the Ministry of Economy controlled by the Government of Argentina—failed to publish prior to the Calculation Date for 2013 the data input specified in the contract for the denominator of the rebasing adjustment calculation—*i.e.*, Actual Real GDP for 2013 in 1993 prices—Argentina can therefore use its "judgment" rather than the contractual formula to determine whether a payment was due for 2013.  Thus, Argentina tries to use its own decision not to publish data specified for contractual calculations to justify its rewriting of the contract, or its "atextual" interpretation.  In fact, Argentina's failure to publish the data called for by the contract is improper and provides four independent bases for granting Plaintiffs the relief requested herein.

14.     First, Argentina's failure to publish 2013 Actual Real GDP in 1993 prices and perform the contractually-specified calculations is itself a breach of contract.  The contract specifies that "Actual Real GDP" for any Reference Year as used in contractual calculations is a figure "as published by INDEC."  Thus, in order to properly calculate the adjustment fraction upon a rebasing to determine 2013 Base Case GDP—an input to determine Base Case GDP Growth for 2013—INDEC was required to publish 2013 Actual Real GDP in 1993 prices, prior to the November 1, 2014 Calculation Date for Reference Year 2013.  INDEC is part of and under the control of

the Republic.  It is not simply that the Republic controls INDEC, they are one and the same legal entity.  Accordingly, the decision not to publish 2013 Actual Real GDP in 1993 prices—and the action in failing to do so—are the decision and action of the Republic in breach of its contractual obligations.  Under these circumstances, the contract as written requires that Argentina ensure the publication of this data and perform calculations as specified in the contract.

15.    Second, the Republic breached the contract by deliberately choosing to ignore the express terms of the contractual adjustment fraction, and furthermore electing not to obtain the approval of at least 75% of GDP Securities holders in deviating from these terms, as is required by the "Modifications" provision of the contract.

16.    Third, to the extent that the contractual formula in the Securities is interpreted as imposing a condition on Securities holders—*i.e.*, to establish entitlement to payment for 2013, Securities holders must use 2013 Actual Real GDP in 1993 prices as published by INDEC—that condition is excused.  Plaintiffs thus are entitled to establish their entitlement to payment by relying on other data published by INDEC that precisely tracks Argentina's Actual Real GDP measured in constant 1993 prices.

17.    Fourth, alternatively, Argentina breached the covenant of good faith and fair dealing by failing to ensure that INDEC published 2013 Actual Real GDP in 1993 prices.  The Republic knew based upon other data published by INDEC that a payment was due for Reference Year 2013, and that if INDEC published 2013 Actual Real GDP in 1993 prices, it would be irrefutable that such payment was due.  Argentina

caused and/or permitted INDEC to withhold this data in order to try to obscure the fact that a payment was due, and to attempt to stymie Securities holders' ability to assert their rights to payment—and so that it could advance the fallacious assertion that it has advanced in the Prior Actions that because the data is supposedly missing, the Republic can ignore the plain language of the contract and unilaterally change its terms.

18.    Plaintiffs are entitled to a judgment for the Payment Amount due for 2013, notwithstanding INDEC's decision not to publish 2013 Actual Real GDP in 1993 prices.  Because Argentina is entirely responsible for the unavailability of that figure, Plaintiffs are entitled to establish liability and damages for the Republic's breach of its obligations by relying upon other data published by INDEC prior to the Calculation Date for Reference Year 2013 to determine what that missing figure would have been if INDEC had published it.  And, using data published by INDEC that precisely tracks the missing figure, it is clear that all the conditions for payment were met for Reference Year 2013, and the Payment Amount for 2013 can be determined as alleged herein.

19.    In parallel litigation concerning Argentina's Euro-denominated, English law GDP-Linked Securities, which have materially identical terms, captioned *Palladian Partners L.P. and ors v The Republic of Argentina and anor*, [2023] EWHC 711 (Comm) (the "**English Action**"), the High Court of Justice of England and Wales entered judgment against the Republic in April 2023.  The English court, among other things, (i) held that Plaintiffs' interpretation of the contractual adjustment provision was correct; (ii) rejected the Republic's alternative formulations of the adjustment fraction; (iii) found that the Securities contained an implied obligation that the Republic would

publish Actual Real GDP measured in constant 1993 prices; (iv) concluded that a Payment Amount was due for Reference Year 2013 using the same calculations relied on by Plaintiffs here, and ordered that the Republic make such payment; and (v) ordered the Republic to publish Actual Real GDP measured in constant 1993 prices for all Reference Years from 2014 until the Securities mature.  The English court also reached a different conclusion concerning the No-Action Clause than this Court reached when it dismissed the Prior Actions, holding that individual Holders had the right to bring suit for their portions of the Payment Amount notwithstanding the No-Action Clause under the governing documents.  The judgment in the English Action was upheld on appeal in June 2024.

20.     Here, if Argentina had complied with the contract, including using adjusted Base Case GDP to calculate Base Case GDP Growth and publishing 2013 Actual Real GDP in 1993 prices, Argentina should have paid $1,321,922,620, or 7.680% of the notional amount of all the GDP Securities issued, on December 15, 2014.[3]  Plaintiffs seek judgment for (1) the unpaid $1,321,922,620 Payment Amount due with respect to the GDP Securities for Reference Year 2013, or, alternatively, for (2) those portions of the Payment Amount representing each Plaintiff's beneficial ownership interest in the GDP Securities; plus all applicable pre-judgment interest through the entry of the judgment and post-judgment interest thereafter until payment is made.

---

[3] Plaintiffs understand that Argentina or its instrumentalities currently own a substantial portion of the GDP Securities, so the amount that Argentina owes to holders other than itself is somewhat less than the figure above.

**The Parties**

21.     Plaintiff Aurelius Capital Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $739,559,967 notional amount of 2005 GDP Securities and $57,599,231 notional amount of 2010 GDP Securities subject to the Prior Actions.  The management company for Aurelius Capital Master, Ltd. was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

22.     Plaintiff ACP Master, Ltd. is a Cayman Islands exempted company.  It is the beneficial owner of $503,558,976 notional amount of 2005 GDP Securities and $935,704,368 notional amount of 2010 GDP Securities subject to the Prior Actions.  The management company for ACP Master, Ltd. was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

23.     Plaintiff Novoriver S.A. is a *sociedad anónima* organized under the laws of the Oriental Republic of Uruguay.  It is the beneficial owner of $93,201,124 notional amount of 2005 GDP Securities and $89,825,232 notional amount of 2010 GDP Securities subject to the Prior Actions.

24.     Plaintiff 683 Capital Partners, LP is a Delaware limited partnership.  It is the beneficial owner of $341,331,000 notional amount of 2005 GDP Securities subject to the Prior Actions.  The management company for 683 Capital Partners, LP was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

25.     Plaintiff Adona LLC is a Delaware limited liability company.  It is the beneficial owner of $120,000,000 notional amount of 2005 GDP Securities subject to the Prior Actions.

26.     Plaintiff Egoz I LLC is a Delaware limited liability company.  It is the beneficial owner of $95,101,000 notional amount of 2005 GDP Securities and $17,719,000 notional amount of 2010 GDP Securities subject to the Prior Actions.  The management company for Egoz I LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

27.     Plaintiff Egoz II LLC is a Delaware limited liability company.  It is the beneficial owner of $59,399,000 notional amount of 2005 GDP Securities and $9,281,000 notional amount of 2010 GDP Securities subject to the Prior Actions.  The management company for Egoz II LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

28.     Plaintiff Mastergen, LLC is a Delaware limited liability company.  It is the beneficial owner of $424,654,388 notional amount of 2005 GDP Securities and $131,100,000 notional amount of 2010 GDP Securities subject to the Prior Actions.

29.     Plaintiff Erythrina, LLC is a Delaware limited liability company. It is the beneficial owner of $47,902,911 notional amount of 2005 GDP Securities subject to the Prior Actions.

30.     Plaintiff AP 2016 1, LLC is a Delaware limited liability company.  It is the beneficial owner of $93,547,937 notional amount of 2005 GDP Securities subject to the Prior Actions.  The management company for AP 2016 1, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

31.     Plaintiff AP 2014 3A, LLC is a Delaware limited liability company.  It is the beneficial owner of $10,324,000 notional amount of 2005 GDP Securities subject to the Prior Actions.  The management company for AP 2014 3A, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

32.     Plaintiff AP 2014 2, LLC is a Delaware limited liability company.  It is the beneficial owner of $9,672,519 notional amount of 2005 GDP Securities subject to the Prior Actions.  The management company for AP 2014 2, LLC was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

33.     Plaintiff WASO Holding Corporation is an Exempted Company incorporated in the Cayman Islands.  It is the beneficial owner of $710,725,000 notional amount of 2005 GDP Securities subject to the Prior Actions.  The management company for WASO Holding Corporation was located in New York at the time of the purchases of the GDP Securities on which it has brought suit.

34.     Plaintiff Ape Group SpA is a *società per azioni* organized under the laws of the Italian Republic.  It is the beneficial owner of $18,000,000 notional amount of 2005 GDP Securities subject to the Prior Actions.

35.     Plaintiff Romano Consulting SpA is a *società per azioni* organized under the laws of the Italian Republic.  It is the beneficial owner of $21,000,000 notional amount of 2005 GDP Securities subject to the Prior Actions.

36.     Plaintiff Icaro SRL is a *società a responsabilità limitata* organized under the laws of the Italian Republic.  It is the beneficial owner of $5,000,000 notional amount of 2005 GDP Securities subject to the Prior Actions.

37.     Plaintiff Elazar Romano is a citizen of the Italian Republic.  He is the beneficial owner of $82,000,000 notional amount of 2005 GDP Securities subject to the Prior Actions.

38.     Defendant the Republic of Argentina is a foreign state as defined in 28 U.S.C. § 1603(a).

### Jurisdiction, Venue and Choice of Law

39.     In the Governing Documents**,** Argentina explicitly and irrevocably waived sovereign immunity to the fullest extent permitted by the laws of the United States in any action with respect to the GDP Securities.  Thus, Argentina is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or under any applicable international agreement, and this Court therefore has jurisdiction pursuant to 28 U.S.C. § 1330.

40.     In the Governing Documents, Argentina irrevocably submitted to the jurisdiction of this Court over any action with respect to the GDP Securities, and appointed Banco de la Nación Argentina, at its office at 225 Park Avenue, New York, New York 10169, as its authorized agent for service of process.

41.     In the Governing Documents, Argentina waived any objection based on venue or otherwise to any action with respect to the GDP Securities being brought in this Court, and venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

14

42.     Argentina agreed that the Governing Documents shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.

### Compliance with the "No-Action Clause"

43.     The Global Security (as defined below) and the Trust Indenture governing the GDP Securities authorize beneficial owners of GDP Securities, like Plaintiffs, to "institute any suit, action or proceeding in equity or at law upon or under or with respect to the" the GDP Securities in certain circumstances, including but not limited to if:  (i) such beneficial owner previously gave the **Trustee** for the GDP Securities—here, The Bank of New York Mellon—written notice of default and the continuance thereof with respect to the Securities; (ii) beneficial owners of not less than 25% in aggregate notional amount of the outstanding Securities made a written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee; (iii) such beneficial owners provided the Trustee with reasonable indemnity and/or security as it may require against the costs, expenses and liabilities to be incurred in connection with such litigation; (iv) the Trustee fails to institute any such action, suit or proceeding for 60 days after its receipt of the notice of default, request and provision of indemnity and/or security; and (v) the Trustee shall not have received a direction inconsistent with the written request.  (2005 Global Security (Exhibit B hereto), § 11; 2010 Global Security (Exhibit D hereto), § 9; *see also* Trust Indenture (Exhibit A hereto), § 4.8.)

44.     Together with others, Plaintiffs delivered notices of default, dated October 7, 2023 and July 19, 2024, to the Trustee with respect to the Republic's failure to make the payment required under the GDP Securities for Reference Year 2013.

45.      On July 25, 2024, Plaintiffs and others, whose beneficial holdings of the 2005 and the 2010 GDP Securities exceed 25% in aggregate notional amount of the outstanding Securities of each series, made a written request to the Trustee to institute an action, in its own name as Trustee, against the Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013.

46.      On July 25, 2024, Plaintiffs and others, whose beneficial holdings of the 2005 and the 2010 GDP Securities exceed 25% in aggregate notional amount of the outstanding Securities of each series, provided the Trustee with reasonable indemnity and/or security against the costs, expenses and liabilities to be incurred in connection with such an action.

47.      More than 60 days have passed since the Trustee's receipt of Plaintiffs' notice of default, request and provision of indemnity and/or security, and the Trustee has not instituted any action against the Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013.

48.      The Trustee has not received any direction inconsistent with Plaintiffs' written request that the Trustee institute an action against the Republic for its failure to make the payment required under the GDP Securities for Reference Year 2013.

49.      Accordingly, Plaintiffs are authorized to bring this action under Section 11 and Section 9 of the 2005 and the 2010 Global Security, respectively, and Section 4.8 of the Trust Indenture governing the GDP Securities to recover the unpaid Payment Amount due for Reference Year 2013.  Plaintiffs seek judgment for (1) the unpaid $1,321,922,620 Payment Amount due with respect to the GDP Securities for

Reference Year 2013, or, alternatively, for (2) those portions of the Payment Amount representing each Plaintiff's beneficial ownership interest in the GDP Securities; plus all applicable pre-judgment interest through the entry of the judgment and post-judgment interest thereafter until payment is made.

**Factual Allegations**

50.     The "**Governing Documents**" for the GDP Securities include: (i) the Trust Indenture, dated as of June 2, 2005 (a copy of which is attached hereto as Exhibit A); (ii) the 2005 Form of Registered Global Security (the "**2005 Global Security**"), applicable to the 2005 GDP Securities only (a copy of which is attached hereto as Exhibit B); (iii) the First Supplemental Indenture, dated as of April 30, 2010, applicable to the 2010 GDP Securities, but not the 2005 GDP Securities (a copy of which is attached hereto as Exhibit C); and (iv) the 2010 Form of Registered Global Security (the "**2010 Global Security**"), applicable to the 2010 GDP Securities only (a copy of which is attached hereto as Exhibit D).  The 2005 and 2010 Global Securities are substantially the same, and are referred to herein collectively as the "**Global Security**."[4]

51.     Under the terms of the Global Security, Argentina promised to pay the "Payment Amount" subject to three conditions:  (i) Actual Real GDP exceeds Base Case GDP for the Reference Year (the **first condition**); (ii) Actual Real GDP Growth exceeds Base Case GDP Growth for the Reference Year (the **second**

---

[4] To the extent not otherwise defined herein, all capitalized terms have the meaning set forth in the Global Security.

4866-9062-1929.1

**condition**); and (iii) the aggregate payments to date under the GDP Securities and the Payment Amount do not exceed the Payment Cap (the **third condition**).

52.     The calculation of the Payment Amount and determination of the conditions set forth in the Global Security are based on GDP data, and the Republic has a contractual obligation to publish that data through INDEC.  As the Republic has acknowledged in the Prior Actions, "[t]he Global Security specifies that payment amount calculations will be based on the GDP figures published by . . . [INDEC]." INDEC is a part of the Republic's Ministry of Economy and subject to direct oversight by the President, who may issue instructions and orders to INDEC and even overrule INDEC's decisions.  Under Argentine law, INDEC does not have a legal identity separate from that of the Republic.

53.     In particular, Argentina has an obligation to publish (through INDEC **Actual Real GDP**, which under the Global Security "means for any Reference Year the gross domestic product of Argentina for such Reference Year measured in constant prices for the Year of Base Prices, as published by INDEC."  Because INDEC is part of the Republic, the Republic has the power to compel INDEC to publish this data.  Thus, the Global Security obligates the Republic to ensure that INDEC does so. Indeed, absent that obligation, the contractual terms would be nonsensical because there would be contractual formulas for payment amounts and conditions for payment but no assurance that the inputs for such formulas would ever be available.  Moreover, if Argentina has no obligation to publish Actual Real GDP, and the absence of that data means Securities holders have no entitlement to payment, then the Securities would be valueless.

54.     For each Reference Year, calculations to determine whether a payment is due are required to be made on the **Calculation Date**, defined in the Global Security as "for any Reference Year, the 1st of November of the calendar year following such Reference Year"; and payment is required to be made on the **Payment Date**, defined in the Global Security as "for any Reference Year, the 15th of December of the calendar year following such Reference Year."  Calculations under the Global Security are to be based upon data published as of the Calculation Date, not data that may be published thereafter.  For Reference Year 2013, the Calculation Date was November 1, 2014 and the Payment Date was December 15, 2014, and all calculations with respect to Reference Year 2013 were required to have been performed by November 1, 2014 based upon data published as of that date.

***Rebasing Adjustments Required by the Global Security***

55.     Generally speaking, GDP is a measure of the goods and services produced in an economy.  Nominal GDP measures the quantity of goods and services based upon current prices, which may increase or decrease over time.  Real GDP, by contrast, measures the quantity of goods and services assuming prices remain constant over time, thereby controlling for the effects of inflation and deflation.

56.     When INDEC measures Actual Real GDP, it applies the prices from a base year, or what the Global Security refers to as the Year of Base Prices.  The Global Security initially set the Year of Base Prices at 1993, but it provided that INDEC could choose to employ a different Year of Base Prices.  Specifically, the **Year of Base Prices** as defined in the Global Security "means the year 1993; provided that if the calendar year employed by INDEC for purposes of determining Actual Real GDP shall

at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year."

57.    Setting the initial Year of Base Prices at 1993 made sense because INDEC was using 1993 prices to publish Actual Real GDP when the GDP Securities were issued.  Likewise, the Global Security used 1993 prices to set the initial values for Base Case GDP, which (as explained below) is the baseline for calculating the Payment Amount and determining if the conditions for payment have been met.

58.    However, changing the Year of Base Prices affects the calculation of Actual Real GDP and Actual Real GDP Growth.  Rebasing may, for example, cause Actual Real GDP for a given year to be a larger or smaller figure than the figure reported in the old Year of Base Prices (although usually larger since prices tend to rise over time), and may cause Actual Real GDP Growth also to be a larger or smaller figure, even though changing the Year of Base Prices does not change the quantity of good and services produced in the Argentine economy.

59.    The Payment Amount and the conditions for payment depend upon whether and the extent to which Actual Real GDP and Actual Real GDP Growth exceed Base Case GDP and Base Case GDP Growth, respectively.  Because changing the Year of Base Prices affects the measurement of Actual Real GDP and Actual Real GDP Growth, changing the Year of Base Prices could significantly affect the calculation of the Payment Amount and whether the payment conditions have been met—unless there is an adjustment to Base Case GDP that accounts for the change in the Year of Base Prices.  Without such an adjustment, Argentina could potentially

deprive Securities holders of their rights to payment for a given year by simply rebasing.

60.    The Global Security provisions for adjusting Base Case GDP ensure that the rights of holders to receive payments, and the obligations of Argentina to make payments, are substantially the same after a rebasing as before.  In the absence of the adjustment, Actual Real GDP and Actual Real GDP Growth would be measured in prices of the new Year of Base Prices, while Base Case GDP and Base Case GDP Growth would be measured in 1993 prices.  With the adjustment, the comparison between Actual Real GDP and Base Case GDP, and between Actual Real GDP Growth and Base Case GDP Growth, remains "apples to apples" as it was when the GDP Securities were initially issued and the Year of Base Prices was 1993.

61.    The adjustment provision is found in the definition of **Base Case GDP**.  The definition of Base Case GDP contains a chart setting forth the initial Base Case GDP values measured in constant 1993 prices.  The chart in the Global Security for the 2005 GDP Securities starts with Reference Year 2005.  The chart in the Global Security for the 2010 GDP Securities starts with Reference Year 2009, and for that year and all the subsequent years for the duration of the Securities, the Base Case GDP is the same for the 2005 and 2010 GDP Securities.

62.    In addition to the chart, the definition of Base Case GDP prescribes the adjustment that must be made to the figures in the chart when INDEC rebases:

> if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP *for each Reference Year* shall be adjusted to

21

reflect any such change in the Year of Base Prices by ***multiplying the Base Case GDP for such Reference Year*** (as set forth in chart [contained in the Global Security]) ***by a fraction***, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and ***the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices***.  (Emphasis added.)

Thus, if a change in the Year of Base Prices occurs, then (for any Calculation Date thereafter) the Base Case GDP for any given Reference Year will be adjusted by a ratio of two different measures of Actual Real GDP for that Reference Year—using prices from the revised Year of Base Prices for the numerator, and using prices from the original Year of Base Prices (1993) for the denominator.  If, for example, the change in the Year of Base Prices caused Actual Real GDP for a given year to be 50% higher than it would have been using 1993 prices, Base Case GDP for that year would be adjusted upward by 50%.  The adjustment fraction is calculated separately for each Reference Year.

63.     Just as the Global Security requires that Argentina (through INDEC) publish Actual Real GDP employing the new Year of Base Prices for each Reference Year, it also requires that after a rebasing Argentina (through INDEC) continue to publish Actual Real GDP in 1993 prices for each Reference Year because that figure is the denominator input for the adjustment fraction.  Again, INDEC is a part of the Ministry of Economy of the Republic and subject to direct oversight by the President, who may issue instructions and orders to INDEC and overrule INDEC's decisions.  The Republic has the power to compel INDEC to publish Actual Real GDP in 1993 prices, and the contract obligates the Republic to ensure that INDEC does so, so that after a rebasing such data would be available to calculate the adjustment fraction.

22

64.     In 2013, as it was becoming apparent that Argentina would owe a payment under the GDP Securities with respect to Reference Year 2013, the Republic announced that it was changing the Year of Base Prices from 1993 to 2004.  Because as of the Calculation Date for Reference Year 2013—November 1, 2014—INDEC was employing 2004 instead of 1993 as the Year of Base Prices, the Global Security required that Argentina (through INDEC) publish Actual Real GDP in the new Year of Base Prices (2004) and in the original Year of Base Prices (1993) so that the adjustment fraction in the definition of Base Case GDP could be calculated and applied.

65.     As explained below, Base Case GDP for both 2012 and 2013 are part of the calculations under the GDP Securities for Reference Year 2013, so the adjustment fraction for each year needed to be separately calculated.  To do so, Argentina (through INDEC) was obligated to publish Actual Real GDP in both 2004 and 1993 prices for both years.  While INDEC published Actual Real GDP in 2004 prices for 2012 and 2013, and Actual Real GDP in 1993 prices for 2012, it did not publish Actual Real GDP in 1993 prices for 2013.

66.     That Argentina may have decided to rebase does not relieve it of its obligation to continue to publish Actual Real GDP in 1993 prices.  The Global Security expressly anticipates and thus promises that such data will be available after a rebasing for each Reference Year.  Argentina's decision to not publish Actual Real GDP in 1993 prices for the full-year 2013 was willful and in bad faith.  Had Argentina done so, it would have been clear that a payment was due under the GDP Securities. Argentina withheld the full-year 2013 figure in an attempt to hide the fact that a payment was due and to frustrate Securities holders' ability to calculate the adjustment

fraction set forth in the Global Security, and thereby show that the second condition (the growth condition) to Argentina's payment obligation had been satisfied. Argentina apparently believed that if it withheld the data to calculate the adjustment fraction, it could avoid having to comply with the express rebasing adjustment terms found in the definition of Base Case GDP, and unilaterally modify the definition of Base Case GDP Growth to its advantage.

67.　　But Argentina's failure to publish Actual Real GDP in 1993 prices does not allow it to ignore the express rebasing provisions or permit it to re-write the terms of the contract to address an absence of data for which it is solely responsible. It does, however, relieve Plaintiffs of any obligation to establish their entitlement to the benefit of the contract, including payment, by relying on figures that Argentina (through INDEC) was obligated, but failed, to publish.

68.　　Using other data published by INDEC as of the Calculation Date, the Court can derive what the full-year 2013 figure for Actual Real GDP in 1993 prices would have been had Argentina published the figure. INDEC published Actual Real GDP in 1993 prices for the first three quarters of 2013. It also published an index of economic activity based upon 1993 prices (the "**EMAE Index**") for the full year 2013, which took into account the Actual Real GDP data measured in 1993 prices published for the first three quarters, used information and methodology used to calculate Actual Real GDP measured in 1993 prices,[5] and exactly tracked Actual Real GDP measured in

---

[5] According to INDEC, when it prepares the EMAE Index, it "tr[ies] to replicate, to the extent possible, the use of the sources of information and the calculation methods of the quarterly and/or annual GDP."

1993 prices.  (*See* Exhibits F & G.)  Thus, based upon data INDEC published as of the

Calculation Date, the full-year Actual Real GDP for Reference Year 2013 measured in

1993 prices that INDEC should have published can be determined.[6]

69.    The adjustment fraction for Reference Year 2012 is Actual Real

GDP for 2012 in 2004 prices (ARS 844.8 billion)[7] divided by Actual Real GDP for

2012 in 1993 prices (ARS 468.3 billion), or 1.80.  Actual Real GDP for 2012 in both

1993 prices and 2004 prices was published by INDEC.  Multiplying the adjustment

fraction for 2012 by the Base Case GDP for 2012 from the chart in the Global Security

(ARS 361.1 billion) produces an adjusted Base Case GDP figure for 2012 of ARS 651.5

billion.  (*See* Exhibit E, Rows 6-10.)

70.    The adjustment fraction for Reference Year 2013 is Actual Real

GDP for 2013 in 2004 prices (ARS 869.5 billion) divided by Actual Real GDP for 2013

in 1993 prices (ARS 491.3 billion), or 1.77.  The figure for Actual Real GDP for 2013

in 1993 prices is derived using the EMAE Index data published by INDEC as of the

Calculation Date for 2013; the figure for Actual Real GDP for 2013 in 2004 prices was

---

[6]  Since the full-year EMAE Index based on constant 1993 prices was 4.914%
greater in 2013 than 2012, then full-year Actual Real GDP measured in constant 1993
prices was necessarily 4.914% greater in 2013 than 2012.  Since 2012 Actual Real GDP
in 1993 prices was ARS 468.3 billion, 2013 Actual Real GDP in 1993 prices was ARS
468.3 billion multiplied by 1.04914, or ARS 491.3 billion.  (Exhibit E, Row 5.)
Alternatively, using Actual Real GDP for the first three quarters of 2013 as published
by INDEC and using the EMAE Index to estimate the fourth quarter produces the same
full year figure for 2013.

[7]  After November 15, 2014, INDEC published revised data for Actual Real GDP
measured in constant 2004 prices.  Such revised data would not have been available as
of the Calculation Date for Reference Year 2013, and thus could not have been used to
determine the Payment Amount for Reference Year 2013.

published by INDEC.  Multiplying the adjustment fraction for 2013 by the Base Case
GDP for 2013 from the chart in the Global Security (ARS 372.8 billion) produces an
adjusted Base Case GDP figure for 2013 of ARS 659.7 billion.  (*See* Exhibit E, Rows
11-15.)

71.    With the adjusted Base Case GDP figures for 2012 and 2013, the
Payment Amount and conditions for payment for Reference Year 2013 that should have
been calculated if Argentina had followed the terms of the contract and published the
required data can be determined, as explained below and as set forth in Exhibit E.

***All the Conditions for Payment Were Satisfied for Reference Year 2013***

72.    The Global Security provides that holders of the GDP Securities
are only entitled to receive the Payment Amount in respect of any Reference Year if:
(i) Actual Real GDP was greater than Base Case GDP for such Reference Year,
(ii) Actual Real GDP Growth was greater than Base Case GDP Growth for such
Reference Year, and (iii) the aggregate payments to date under the GDP Securities and
the Payment Amount do not exceed the Payment Cap.  *See* Exhibit B (2005 Global
Security), § 2(b); Exhibit D (2010 Global Security), § 2(b).  For Reference Year 2013,
all three of these conditions were satisfied.

73.    As to the **first condition**, Actual Real GDP for Reference Year
2013, *i.e.*, ARS 869.5 billion (Exhibit E, Row 28), is greater than Base Case GDP for
Reference Year 2013, *i.e.*, ARS 659.7 billion (Exhibit E, Row 29), so the first condition
was satisfied.

74.    As to the **second condition**, Actual Real GDP Growth for
Reference Year 2013 was greater than Base Case GDP Growth for 2013.

26

75.    **Actual Real GDP Growth** as defined in the Global Security

"means, for any Reference Year, the percentage change in Actual Real GDP for such

Reference Year, as compared to Actual Real GDP for the immediately preceding

Reference Year,

> provided that, if the Year of Base Prices employed by
> INDEC for determining Actual Real GDP for such
> Reference Year and for the immediately preceding
> Reference Year **shall differ**, then Actual Real GDP for the
> immediately preceding Reference Year shall for this
> purpose be measured using constant prices for the Year of
> Base Prices applicable to the Reference Year in respect of
> which Actual Real GDP Growth is being determined.
> (Emphasis added.)

The above-quoted provision addresses the possibility that, for the Reference Year in

question, INDEC may be using a Year of Base Prices that is different than the Year of

Base Prices it used for the immediately preceding Reference Year.  That is the situation

for Reference Year 2013.  For Reference Year 2013, INDEC was using 2004 as the

Year of Base Prices; but for Reference Year 2012, INDEC had used 1993 as the Year of

Base Prices.

76.    Accordingly, in order to determine Actual Real GDP Growth for

Reference Year 2013, it is necessary to compare Actual Real GDP for Reference Year

2013 to Actual Real GDP for Reference Year 2012 using 2004 as the Year of Base

Prices for both.  As noted above, INDEC reported Actual Real GDP for Reference Year

2013 measured in constant 2004 prices as ARS 869.5 billion.  (Exhibit E, Row 28.)

According to INDEC, Actual Real GDP for Reference Year 2012 measured in constant

2004 prices was ARS 844.8 billion.  (Exhibit E, Row 6.)  Thus, Actual Real GDP

Growth for Reference Year 2013 was 2.925% (ARS 869.5 billion divided by ARS

844.8 billion, minus 1).  (Exhibit E, Row 30.)

77.    **Base Case GDP Growth** as defined in the Global Security "means, for any Reference Year, the percentage change in Base Case GDP for such Reference Year, as compared to Base Case GDP for the immediately preceding Reference Year . . . ."  As noted above, when there is a change in the Year of Base Prices, the figure for Base Case GDP in the chart in the Global Security needs to be adjusted.  As explained above, Base Case GDP for Reference Years 2012 and 2013 after making the adjustment for the change in the Year of Base Prices from 1993 to 2004 is ARS 651.5 billion and ARS 659.7 billion, respectively.  (Exhibit E, Rows 10 & 15.)  Base Case GDP Growth from 2012 to 2013 is therefore 1.263% (ARS 659.7 billion divided by ARS 651.5 billion, minus 1) (Exhibit E, Row 31), which is less than the Actual Real GDP Growth of 2.925% (ARS 869.5 billion divided by ARS 844.8 billion, minus 1) (Exhibit E, Row 30).

78.    Because Actual Real GDP Growth for Reference Year 2013 was 2.925%, exceeding Base Case GDP Growth of 1.263% for that Reference Year, the second condition was satisfied.

79.    As to the **<u>third condition</u>**, the Global Security defines the **Payment Cap** as "on any given day, an amount equal to [a certain percentage— 48.000% for the 2005 GDP Securities and 40.609% for the 2010 GDP Securities] of the notional amount of this Security outstanding as of such day."[8]  As of the Calculation

---

[8] The lower Payment Cap for the 2010 GDP Securities reflects payments made to holders of the 2005 GDP Securities before the issuance of the 2010 GDP Securities. The holders of the 2010 GDP Securities are not entitled to receive such payments retroactively, but the holders of the 2005 and 2010 GDP Securities are otherwise treated similarly going forward, so the amount remaining under the Payment Cap is the same for both the 2005 and 2010 GDP Securities.

4866-9062-1929.1

Date for Reference Year 2013, 29.960% of the notional amount—or $0.2996 per notional dollar of GDP Securities —remained under the Payment Cap for both the 2005 and 2010 GDP Securities.  (Exhibit E, Rows 35 & 39.)  As discussed below, the Payment Amount for Reference Year 2013 was 7.680% of the notional amount, or $0.07680 per notional dollar, of GDP Securities (Exhibit E, Rows 33 & 37), well within the remaining Payment Cap, satisfying the third condition.

***Calculation of the Payment Amount***

80.    The first step in calculating the Payment Amount for Reference Year 2013 is to multiply Actual Real GDP and Base Case GDP by the GDP Deflator to determine Actual Nominal GDP and Nominal Base Case GDP, respectively.  The **GDP Deflator** as defined in the Global Security "means, for any Reference Year, the number that results from dividing (i) the gross domestic product of Argentina for such Reference Year measured at the current prices of such Reference Year, as published by INDEC, by (ii) the Actual Real GDP for such Reference Year."  For Reference Year 2013, Argentina's GDP at current prices as published by INDEC was ARS 3,339.6 billion (Exhibit E, Row 16), and the Actual Real GDP (using 2004 as the now operative Year of Base Prices) was ARS 869.5 billion (Exhibit E, Row 17), so the GDP Deflator for Reference Year 2013 was 3.84 (Exhibit E, Row 18.)

81.    **Actual Nominal GDP** as defined in the Global Security "means for any Reference Year an amount equal to Actual Real GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year."  Thus, Actual Nominal GDP for Reference Year 2013 was ARS 3,339.6 billion (*i.e.*, ARS 869.5 billion multiplied by 3.84).  (Exhibit E, Row 16.)

29

82.    **Nominal Base Case GDP** as defined in the Global Security "means, for any Reference Year, an amount equal to Base Case GDP for such Reference Year multiplied by the GDP Deflator for such Reference Year."  Thus, the Nominal Base Case GDP for Reference Year 2013 was ARS 2,533.7 billion (*i.e.*, ARS 659.7 billion multiplied by 3.84).  (Exhibit E, Row 19.)

83.    The difference between Actual Nominal GDP and Nominal Base Case GDP is Excess GDP.  **Excess GDP** as defined in the Global Security "means, for any Reference Year, the amount (expressed in billions of Argentine pesos), if any, by which Actual Nominal GDP for such Reference Year exceeds the Nominal Base Case GDP for such Reference Year."  Thus, Excess GDP for Reference Year 2013 was ARS 805.9 billion, which represents the difference between Nominal Base Case GDP (ARS 2,533.7 billion) and Actual Nominal GDP (ARS 3,339.6 billion).  (Exhibit E, Row 20.)

84.    Excess GDP is then used to calculate Available Excess GDP. **Available Excess GDP** as defined in the Global Security "means, for any Reference Year, an amount in Argentine pesos equal to (i) 5% of Excess GDP for such Reference Year, multiplied by (ii) the Unit of Currency Coefficient."  The **Unit of Currency Coefficient** is defined in the Global Security to be 0.012225.  (Exhibit E, Row 21.) Accordingly, Available Excess GDP for Reference Year 2013 was ARS 0.49260 per $1.00 USD notional of GDP Securities, *i.e.,* 805.9 multiplied by 0.05 multiplied by 0.012225.  (Exhibit E, Row 22.)

85.    With Available Excess GDP, the Payment Amount can be determined.  **Payment Amount** as defined in the Global Security "means for any Payment Date, an amount equal to (i) the Available Excess GDP (converted into U.S.

dollars) for the Reference Year corresponding to such Payment Date, multiplied by
(ii) the notional amount of this Security outstanding as of such Payment Date. . . ."  To
convert Available Excess GDP into U.S. dollars, the Global Security directs the use of
the average free market exchange rate of ARS to USD during the 15 days preceding
December 31 of the relevant Reference Year, which for Reference Year 2013 was
6.41407 USD/ARS.  (Exhibit E, Row 23.)  The notional amount of outstanding GDP
Securities was approximately $17.2 billion as of December 15, 2014.  (Exhibit E, Row
26.)  Thus, the Payment Amount for 2013 is $1,321,922,620, *i.e.*, 0.49260 divided by
6.41407 multiplied by $17.2 billion (Exhibit E, Row 27)*,* or $0.07680 per notional
dollar of GDP Securities.  (Exhibit E, Row 24.)  With respect to the GDP Securities
owned by Plaintiffs subject to the Prior Actions, Argentina should have paid the
amounts set forth in the table below on December 15, 2014.

| Plaintiff | Notional Beneficial Ownership | Portion of Payment Amount Due to Plaintiff |
|---|---|---|
| Aurelius Capital Master, Ltd. | $797,159,198 | $61,221,826.41 |
| ACP Master, Ltd. | $1,439,263,344 | $110,535,424.82 |
| Novoriver S.A. | $183,026,356 | $14,056,424.14 |
| 683 Capital Partners, LP | $341,331,000 | $26,214,220.80 |
| Adona LLC | $120,000,000 | $9,216,000.00 |
| Egoz I LLC | $112,820,000 | $8,664,576.00 |
| Egoz II LLC | $68,680,000 | $5,274,624.00 |
| Mastergen, LLC | $555,754,388 | $42,681,937.00 |
| Erythrina, LLC | $47,902,911 | $3,678,943.56 |
| AP 2016 1, LLC | $93,547,937 | $7,184,481.56 |
| AP 2014 3A, LLC | $10,324,000 | $792,883.20 |
| AP 2014 2, LLC | $9,672,519 | $742,849.46 |

31

| Plaintiff | Notional Beneficial Ownership | Portion of Payment Amount Due to Plaintiff |
|---|---|---|
| WASO Holding Corporation | $710,725,000 | $54,583,680.00 |
| Ape Group SpA | $18,000,000 | $1,382,400.00 |
| Romano Consulting SpA | $21,000,000 | $1,612,800.00 |
| Icaro SRL | $5,000,000 | $384,000.00 |
| Elazar Romano | $82,000,000 | $6,297,600.00 |

### *Argentina Fails To Make a Payment for Reference Year 2013*

86.     Argentina has articulated two bases for its refusal to make a payment for Reference Year 2013, neither of which has any merit.

87.     First, Argentina announced in 2014 that it was not making a payment because the second condition had not been met—*i.e.*, Actual Real GDP Growth did not exceed Base Case GDP Growth.  The Republic's announcement did not explain the basis for its decision, or provide its calculations of Actual Real GDP Growth or Base Case GDP Growth.  In the Prior Actions, Argentina finally disclosed why it contends that the second condition was not met.

88.     Argentina does not dispute that Actual Real GDP Growth for Reference Year 2013 was 2.925%.  This figure is based on Actual Real GDP measured in 2004 prices because INDEC switched to 2004 prices before the Calculation Date for Reference Year 2013.  The Republic contends, however, that Base Case GDP Growth should be calculated based upon the unadjusted Base Case GDP figures measured in 1993 prices, notwithstanding the adjustment required by the definition of Base Case GDP when there has been a rebasing, as is the case for Reference Year 2013.  This Court has held that such an interpretation is "atextual."  The Global Security's

definition of Base Case GDP Growth incorporates the defined term Base Case GDP, and that definition explicitly requires that Base Case GDP be adjusted for the relevant years when there has been a change in the Year of Base Prices. By refusing to follow the Global Security's express terms, and instead applying its "atextual" reading of the contract to calculate Base Case GDP Growth, the Republic breached the contract willfully, in bad faith and in manifest error.

89.    Second, the Republic contends that because INDEC did not publish Actual Real GDP for 2013 in 1993 prices, the adjustment fraction cannot be calculated, and the Ministry of Economy is free to deviate from the plain terms of the contract when making calculations with respect to the GDP Securities. To the contrary, it was the Republic's obligation to have published (through INDEC) Actual Real GDP for 2013 in 1993 prices by the Calculation Date, and the Republic bears the risk and responsibility for its decision not to do so. Nothing in the Governing Documents shifted to the Securities holders the risk that INDEC would not publish the data, or that Argentina would not ensure that INDEC published the data.

90.    As noted above, INDEC is a part of the Ministry of Economy of the Republic and subject to direct oversight by the President. The GDP Securities required that the Republic ensure that INDEC publish data that the Global Security expressly contemplates would be published by INDEC for contractual calculations. A rebasing does not excuse the Republic from publishing Actual Real GDP in 1993 prices, which the contract expressly identifies as an element of the adjustment fraction.

91.    The decision not to publish Actual Real GDP for 2013 in 1993 prices was arbitrary, willful and in bad faith. Well aware that the Argentine economy

would meet the conditions for a payment for Reference Year 2013, Argentina sought to hide that fact and stymie Securities holders' ability to assert their rights to payment. By inappropriately using the rebasing as an excuse to stop publishing Actual Real GDP in 1993 prices, and in particular the figure for 2013, Argentina attempted to destroy or injure the rights of Plaintiffs and other Securities holders to receive the fruits of the contract.

92.    In the Prior Actions, Argentina has maintained that the "binding effect" clauses in the Global Security give the Ministry of Economy the power to ignore the express adjustment provision in the definition of Base Case GDP and re-write the definition of Base Case GDP Growth. However, as this Court held in the Prior Actions,[9] the "binding effect" clauses—which provide that the Ministry's calculations of the Payment Amount and Excess GDP (a component of Payment Amount) are binding absent "bad faith, willful misconduct or manifest error"—are not applicable to the present dispute for multiple reasons.

93.    First, the "binding effect" clauses do not permit Argentina to deviate from the plain language of the Global Security and unilaterally alter the contractually-mandated formulas for determining whether the conditions for payment have been met. On the contrary, the contract makes clear that Argentina does not have the unilateral right to change any contractual formula or terms. Such changes require

_____

[9] *See Aurelius Cap. Master, Ltd. v. Republic of Argentina*, 2021 WL 1177465, at *8-9 (S.D.N.Y. Mar. 29, 2021).

34

supermajority votes by Securities holders.[10]  Second, the "binding effect" clauses are not found in the definition of Base Case GDP Growth or the provisions of the Global Security setting forth the conditions for payment, and thus, do not apply to the parties' dispute.  And third, even if the "binding effect" clauses applied, they would not protect Argentina because the Ministry has acted in bad faith, with willful misconduct and in manifest error by refusing to follow the plain language of the contract when making calculations and failing to publish data required by the contract, with the goal of destroying or injuring the rights of Plaintiffs to receive the fruits of the contract, including but not limited to their rights to payment with respect to Reference Year 2013.

***The English Action***

94.    On April 5, 2023, after an 11-day trial, the court in the English Action issued its judgment against the Republic, ruling that the "appropriate construction" of the contractual adjustment provision is exactly as Plaintiffs allege here and requires the Republic to pay the Payment Amount for Reference Year 2013.  The English court expressly rejected the Republic's alternative interpretations of the contractual adjustment provision as both inconsistent with the plain words of the contract and commercially unreasonable.

---

[10] For example, under the "Modifications" provision of the Global Security, a change to the "method of calculation of the Payment Amounts" for a single series of Securities requires the consent of 75% of Securities holders.  The "binding effect" clause in the definition of Payment Amount does not empower Argentina to modify the contractual formula without obtaining the requisite consents from Securities holders.

95.     The English court also concluded—and the Republic conceded—that there was an implied obligation in the GDP Securities' contract which required the Republic to publish Actual Real GDP measured in 1993 prices for the life of the Securities.  On this basis, the English court ordered the Republic (*i.e.*, INDEC) to publish Actual Real GDP measured in constant 1993 prices for Reference Years starting with 2014 through the maturity of the GDP Securities.  The Republic's counsel represented to the English court was that the Republic was "ready, willing and able" to do so if ordered by the court.

96.     The English court determined the payment amount due to Securities holders by estimating 2013 Actual Real GDP measured in constant 1993 prices, exactly as Plaintiffs have done here—*i.e.*, by utilizing INDEC's publication of Actual Real GDP for the first three quarters of 2013 and the EMAE Index figures for the three months of the fourth quarter, all measured in constant 1993 prices, to calculate a figure of 491 billion pesos for Actual Real GDP measured in constant 1993 prices for Reference Year 2013.  The English court ordered the Republic to pay the Payment Amount due for Reference Year 2013.

97.     The English court also held that individual Holders of GDP Securities have a right under the Global Securities to bring suit to recover the portion of the Payment Amount corresponding to their beneficial ownership and that the No-Action Clause does not impair their right to do so.

98.     On June 12, 2024, the English Court of Appeal issued an Approved Judgment in which it agreed with the reasoning and conclusions of the trial court, affirmed the judgment of the trial court, and dismissed the Republic's appeal.

## Claim for Relief
### (Breach of Contract, including in the alternative, Breach of the Covenant of Good Faith and Fair Dealing)

99.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 98.

100.     Argentina breached the contract in at least three ways:  First, Argentina failed to pay Securities holders in respect of Reference Year 2013.  Second, Argentina failed to publish 2013 Actual Real GDP in 1993 prices prior to the Calculation Date for Reference Year 2013 and, therefore, failed to perform the contractually mandated calculations to adjust Base Case GDP after the rebasing.  Third, Argentina attempted to unilaterally change the terms of the contract without complying with the "Modifications" provision in the Global Security, which requires a supermajority vote of Securities holders.  Plaintiffs are therefore entitled to the relief requested herein.

101.     As explained above, Argentina decided not to publish (through INDEC) Actual Real GDP for 2013 in 1993 prices, one of two inputs for the rebasing adjustment fraction required by the express terms of the definition of Base Case GDP. The contract called for the publication of this data by INDEC; INDEC is part of and under the control of the Republic and the Republic could have caused INDEC to publish this figure.  Thus, the contract required Argentina to ensure the publication of this data and the Republic's failure to do so is a breach of contract.

102.     In addition, as explained above, the contract requires that when a rebasing has occurred, Base Case GDP for the relevant years must be adjusted as specified in the definition of Base Case GDP; and the contract further requires that the

37

adjusted Base Case GDP figures for the years in question must be used in the calculation of Base Case GDP Growth. Argentina did not apply the adjustment fraction to Base Case GDP, and did not use adjusted Base Case GDP to calculate Base Case GDP Growth. It, therefore, failed to perform the calculations required by the Global Security, which is itself a breach of contract.

103.    What Argentina did amounted to a unilateral modification of the Global Security, without the supermajority vote of holders required by the "Modifications" provision. Argentina's failure to follow the express terms of the contract, its assertion that no payment was due for Reference Year 2013 based upon its incorrect interpretation of the contract, and its failure to comply with the "Modifications" provision of the Global Security, breached the contract and entitle Plaintiffs to the relief requested herein.

104.    Further, because Argentina failed to publish Actual Real GDP for 2013 in 1993 prices, Plaintiffs are relieved of any obligation to rely upon the missing data to establish their rights under the Securities, and are entitled to rely upon other data published by INDEC as of the Calculation Date for Reference Year 2013 to establish their rights to payment.

105.    In the alternative, if the terms of the contract as written do not require that Argentina (through INDEC) publish Actual Real GDP for Reference Year 2013 in 1993 prices, then Argentina had an obligation under the implied covenant of good faith and fair dealing to cause INDEC to publish this data. The data was called for by the terms of the contract, and reasonable persons in the position of Securities holders would be justified in understanding that the Republic was promising to ensure that

INDEC published the data because INDEC was part of the Ministry of Economy and under the control of the Republic.  Reasonable persons in the position of Securities holders would also be justified in understanding that the Republic was promising to cause INDEC to publish Actual Real GDP in 1993 prices notwithstanding a change in the Year of Base Prices because otherwise the contract would not have been written with a rebasing adjustment that called for such data.

106.     Argentina acted in bad faith by failing to ensure that INDEC published Actual Real GDP for Reference Year 2013 in 1993 prices.  INDEC published Actual Real GDP in 1993 prices for the first three quarters of 2013, and published full-year economic activity data for 2013 that was based on the same data and methodology used to publish Actual Real GDP in 1993 prices.  The Republic knew based upon this data that Argentina would meet the conditions for a payment for Reference Year 2013, and that if INDEC published Actual Real GDP for full-year 2013 in 1993 prices it would be obvious that a payment was due.  Argentina caused and/or permitted INDEC to withhold this data in order to try to obscure the fact that a payment was due, and to attempt to stymie Securities holders' ability to assert their rights to payment—and so that it could advance the fallacious assertion that it has advanced in the Prior Actions that because the data is supposedly missing, the Republic can ignore the plain language of the contract and unilaterally change its terms.  If Securities holders are required to present the missing data to establish their right to payment for 2013, then the Republic's failure to ensure that INDEC published the data would have the effect of destroying and injuring Plaintiffs' right to receive the fruits of the contract.

107.    In sum, under the terms of the GDP Securities, defendant Argentina was contractually obligated to make a Payment Amount of $0.07680 per $1.00 of notional amount of GDP Securities on December 15, 2014.  Argentina breached its contractual obligations by failing to pay the amounts due for Reference Year 2013; by failing to apply the adjustment fraction to Base Case GDP when calculating Base Case GDP Growth and determining the second condition for payment; by unilaterally attempting to change the terms of the contract without complying with the "Modifications" provision of the Global Security; by failing to fulfill its obligations under the language of the contract or the implied covenant of good faith and fair dealing to publish Actual Real GDP for 2013 in 1993 prices; and by withholding the Payment Amount due for Reference Year 2013.

108.    As a result of its breaches, Argentina owes a Payment Amount for Reference Year 2013 of $1,321,922,620, or, alternatively owes each Plaintiff the portion of the Payment Amount representing that Plaintiff's respective beneficial ownership interest in the GDP Securities, plus all applicable pre-judgment interest through the entry of the judgment and post-judgment interest thereafter until payment is made.

## Prayer for Relief

WHEREFORE, Plaintiffs request the entry of judgment against defendant as follows:

(a)    Awarding judgment for the Payment Amount for Reference Year 2013 of $1,321,922,620, or, alternatively, awarding judgment to:

(i)    Plaintiff Aurelius Capital Master, Ltd. for $61,221,826.41, corresponding to the portion of the Payment Amount for

Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(ii)     Plaintiff ACP Master, Ltd. for $110,535,424.82, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(iii)    Plaintiff Novoriver S.A. for $14,056,424.14, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(iv)    Plaintiff 683 Capital Partners, LP for $26,214,220.80, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(v)     Plaintiff Adona LLC for $9,216,000.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(vi)    Plaintiff Egoz I LLC for $8,664,576.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(vii)   Plaintiff Egoz II LLC for $5,274,624.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(viii)  Plaintiff Mastergen, LLC for $42,681,937.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(ix)    Plaintiff Erythrina, LLC for $3,678,943.56, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(x)     Plaintiff AP 2016 1, LLC for $7,184,481.56, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xi)     Plaintiff AP 2014 3A, LLC for $792,883.20, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xii)    Plaintiff AP 2014 2, LLC for $742,849.46, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xiii)   Plaintiff WASO Holding Corporation for $54,583,680.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xiv)    Plaintiff Ape Group SpA for $1,382,400.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xv)     Plaintiff Romano Consulting SpA for $1,612,800.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions;

(xvi)    Plaintiff Icaro SRL for $384,000.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing its beneficial ownership interest in the GDP Securities subject to the Prior Actions; and

(xvii)   Plaintiff Elazar Romano for $6,297,600.00, corresponding to the portion of the Payment Amount for Reference Year 2013 representing his beneficial ownership interest in the GDP Securities subject to the Prior Actions;

together with all pre-judgment interest through entry of judgment and post-judgment interest thereafter, as applicable; and

(b)      Granting Plaintiffs such other relief as the Court deems just and proper.

42

4866-9062-1929.1

Dated:   New York, New York
         September 25, 2024

FRIEDMAN KAPLAN SEILER          BLEICHMAR FONTI &
    ADELMAN & ROBBINS LLP           AULD LLP


By:     _s/ Edward A. Friedman___     By:     _s/ Evan A. Kubota_____
        Edward A. Friedman                    Javier Bleichmar
        Daniel B. Rapport                     Evan A. Kubota
        Michael S. Palmieri          300 Park Avenue, Suite 1301
7 Times Square                       New York, NY 10022
New York, New York 10036             (212) 789-1347
(212) 833-1100


*Attorneys for Plaintiffs Aurelius Capital*     *Attorneys for Plaintiff Novoriver S.A.*
*Master, Ltd. and ACP Master, Ltd.*

PERKINS COIE LLP                     LATHAM & WATKINS LLP


By:     _s/ Matthew M. Ricciardi__     By:     _s/ Matthew S. Salerno____
        Matthew M. Riccardi                    Matthew S. Salerno
        H. Rowan Gaither IV                    Ryan M. Schachne
1155 Ave. of the Americas, 22nd Floor   1271 Avenue of the Americas
New York, New York 10036-2711        New York, New York 10020
(212) 530-1800                       (212) 906-1200


*Attorneys for Plaintiff 683*          *Attorneys for Plaintiffs Adona LLC; Egoz*
*Capital Partners, LP*                 *I LLC; Egoz II LLC; Mastergen, LLC;*
                                       *Erythrina, LLC; AP 2016 1, LLC; AP*
                                       *2014 3A, LLC; AP 2014 2, LLC; and*
                                       *WASO Holding Corporation*

LAW OFFICES OF ERIC J. GRANNIS


By:     _s/ Eric J. Grannis_____
        Eric J. Grannis
11 Broadway, Suite 615
New York, New York 10004
(212) 903-1025


*Attorneys for Plaintiffs Ape Group SpA;*
*Romano Consulting SpA; Icaro SRL;*
*and Elazar Romano*

43